T.C. Memo. 2018-129

UNITED STATES TAX COURT

TERRY L. YARYAN AND DOROTHY H. YARYAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30424-15.                    Filed August 15, 2018.

<u>William L. Henry</u>, <u>David A. Sprecace</u>, and <u>Lucas P. Frei</u>, for petitioners.

<u>Michael T. Garrett</u> and <u>Matthew A. Houtsma</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined the following deficiencies, addition to tax, and accuracy-related penalties with respect to petitioners' Federal income tax for 2008, 2009, 2010, 2012, and 2013 (years in issue):

[*2]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|------|-----------|------------------|------------------|
| 2008 | $11,481 | --- | --- |
| 2009 | 17,985 | --- | --- |
| 2010 | 6,089 | --- | --- |
| 2012 | 15,404 | $770 | (¹) |
| 2013 | 27,249 | --- | $5,450 |

[1]In the first amendment to answer respondent asserted that petitioners are liable for the sec. 6662(a) penalty for 2012.

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

The issues for our consideration are: (1) whether petitioners may deduct under section 166 business bad debts that they contend they incurred during the years in issue;[1] (2) whether petitioners are liable for the addition to tax for 2012; and (3) whether petitioners are liable for the accuracy-related penalties for 2012 and 2013.

---

[1]Petitioners conceded that if they are entitled to deductions for business bad debts for the years in issue, their deductions for capital losses for 2010, 2012, and 2013 should be disallowed.

**[*3]**                                    FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and exhibits are incorporated in our findings by this reference. Petitioners resided in Colorado when they timely filed their petition.

I.      Petitioner's Background and Relationship With Prime Realty, Inc.

Terry L. Yaryan (petitioner) holds a bachelor's degree and a master's degree in electrical engineering. In 1994 he joined UGC Consulting, a firm that specialized in providing consulting services related to geographic information systems. Petitioner retired in 2002.

In 1994 petitioners purchased a home in Colorado from Prime Realty, Inc. (Prime), a Colorado corporation. Petitioner met Leslie Olson (L. Olson), a general contractor who worked on building custom homes and other projects through Prime from at least 1994 to 2011. Prime was an S corporation, and its sole shareholder was Pat Olson (P. Olson), L. Olson's wife.

Shortly after petitioner's retirement, petitioners hired Prime as the general contractor to work on a greenhouse that they planned to build on their property. After completing work on petitioners' home, L. Olson approached petitioner to discuss Prime's construction business. Generally, Prime's business model at that time was to build and market one new home at a time. Petitioner believed that

**[*4]** Prime's business model was inefficient, and he suggested a new strategy in which Prime would focus on building three homes at once.

## II.    Joint Venture Agreement

L. Olson, with the assistance of his attorney, drafted a joint venture agreement (JVA) that he presented to petitioner.[2]  On or about August 5, 2003, petitioner and L. Olson, on behalf of Prime, executed the JVA.  Dorothy H. Yaryan (petitioner wife) was not a party to the JVA.

The JVA named petitioner and Prime as joint venturers and stated the purpose of the joint venture as follows:  "[T]he Joint Venture is formed to invest in real estate vacant lots and construct single family residences upon the Joint Venture residential lots for the purpose of resale to the general public."  It provided that the JVA "shall not be deemed, held, or construed as creating a tax partnership between * * * [petitioner and Prime]."

Pursuant to the JVA Prime would purchase residential lots in its name, and petitioner would hold a secured interest in the lots for his contributions and for a

---

[2]Petitioners describe their agreement as a "joint venture agreement".  We use this term in our Findings to describe the agreement between petitioner and Prime with no inference as to the type of arrangement formed between them.

**[*5]** fee to be paid to him as required by the agreement. The terms of the JVA applied only when Prime granted a deed of trust to petitioner.

The JVA provided that petitioner "shall provide capital funds * * * as needed to purchase mutually agreed upon vacant residential lots." The residential lots would be purchased by Prime, and Prime would be responsible for funding construction of the residences on the lots, either with its own funds or with "separate construction loans solely in the name of Prime". The JVA stated that "[t]he total amount invested * * * [by petitioner] shall not exceed $400,000 unless mutually agreed" by petitioner and Prime.

To the extent that Prime used petitioner's funds to purchase a lot, the JVA provided that "a promissory note payable to * * * [petitioner] secured by a deed of trust for the specific lot * * * will be executed against the ownership of Prime". It provided further that petitioner "shall subordinate his interest in his deed of trust to the interests of the construction lender and * * * shall promptly sign such subordination agreement upon request by Prime".

The JVA provided that petitioner would be paid a sum equal to and not to exceed 15% of his investment in a lot, "which sum shall be so stated in the promissory note * * * for each lot subject to this Joint Venture Agreement and due at closing." Under the JVA Prime was to receive two fees for its services to the

**[\*6]** joint venture, both calculated as percentages of the costs associated with constructing the residences on the lots. Prime would receive fees equal to (1) 8% of construction costs as "compensation for construction supervision and coordination", payable at closing of the sale of the constructed residence, and (2) 7% of construction costs as an "overhead fee", payable monthly based on the last month's construction costs and from the proceeds available from the construction loan. The JVA provided that after all debts and liabilities of the joint venture had been paid in full "investment distributions" of any remaining net proceeds from the sale would be paid to Prime and petitioner "in the same proportions as the investment made or obligation incurred" for the purchase of the lot and the construction of the residence.

The JVA stated that "[e]xcept as set forth in this Agreement" Prime and petitioner "shall have equal rights in the management of the Joint Venture business." It provided further that Prime "shall be solely and exclusively responsible for all aspects of development, design, construction, marketing, and sale" of the residences built on the lots that were the subject of the JVA. With respect to all joint venture lots it stated: "[I]t is understood that Leslie Olson * * * shall be substantially in charge of the construction, development, and sale of the lots."

**[*7]** III.     Activities Conducted Under the JVA

    A.     Joint Venture Profits 2004-06

After executing the JVA petitioner worked with L. Olson in surveying and selecting lots for the joint venture, and Prime purchased the lots that he and L. Olson agreed upon. Prime was responsible for and performed the day-to-day activities of constructing homes on the joint venture lots. From 2004 through 2006 petitioner and Prime, through the joint venture, completed 10 real estate transactions. For each of these transactions petitioner advanced the funds needed for Prime to purchase the lot or, in one instance, to acquire a purchase option.

For 2004-06 petitioners reported profits from the joint venture's real estate transactions on their jointly filed Forms 1040, U.S. Individual Income Tax Return. For each of these years they reported the profits as "Other income" on line 21 of the Form 1040. For 2004-07 petitioners did not file Schedules C, Profit or Loss From Business.

[*8]   B.   Homes Built on Inwood Place and Grande River

      1.   Inwood Place Home

On March 29, 2006, petitioners paid $106,875[3] toward the purchase of a lot in the Painter's Ridge subdivision at 1381 Inwood Place, Castle Rock, Colorado (Inwood Place). Before closing petitioners paid an additional $13,600 to Prime to cover costs at closing, including $5,000 in earnest money and $721 in prepaid taxes. Prime purchased Inwood Place on March 30, 2006. On the same date Prime executed a promissory note for $135,000 payable to petitioner with no interest. The note stated that it was secured by a deed of trust for Inwood Place.

A home was constructed on Inwood Place and was completed in 2007. The Inwood Place home did not sell quickly. On January 30, 2008, petitioner advanced Prime an additional $25,000, which Prime needed as working capital and which was tied to the sale of Inwood Place. L. Olson on behalf of Prime executed a promissory note payable to petitioner for $25,000 with an interest rate of 15%. The note provided that principal and interest would be paid upon the sale of Inwood Place. Petitioner did not record this note.

---

[3]After the closing on Prime's purchase of Inwood Place petitioners received an overpayment refund of $278.

**[*9]** After Inwood Place failed to sell for an extended period, L. Olson had discussions with Prime's construction lender, Bank of Choice, about converting the outstanding construction loan on Inwood Place into a permanent loan if he could arrange to lease the property. Petitioner first became aware that Inwood Place had been leased and was occupied when Bank of Choice contacted him to request that he subordinate his loan interest to a new loan between Bank of Choice and Prime. Petitioner agreed to subordinate his interest because he believed that if he did not then Bank of Choice would refuse to convert Prime's construction loan, and Prime would lose Inwood Place before it could be sold.

In early 2011 petitioner met with an officer at Bank of Choice regarding the outstanding loan for Inwood Place. During that meeting petitioner learned that L. Olson had misrepresented himself as the owner of Prime and that P. Olson was Prime's sole owner. Petitioner learned that Prime had no retained earnings or working capital and no substantial physical assets. After this meeting petitioner was concerned that he would not be repaid and Prime would stop making payments on the Inwood Place loan and allow the property to go into foreclosure.

During 2011 Prime found buyers for Inwood Place. Petitioner refused initially to release the deed of trust for Inwood Place. However, he was told that Bank of Choice was not going to extend Prime's loan for Inwood Place and that

[*10] Prime had a limited time to dispose of the property. Petitioner agreed to release the deed of trust for Inwood Place for $30,000. However, he stated in a letter to the title company that he was not releasing Prime's obligations on the promissory notes that had been tied to the sale of Inwood Place. On October 27, 2011, Prime sold Inwood Place and petitioner received a payoff of $30,000.

Prime did not repay petitioner any additional amounts for his advances for the purchase of Inwood Place or the $25,000 advance that Prime used as working capital. Petitioners' net loss (i.e., total advances over total receipts) in connection with Inwood Place was $115,197, calculated as follows:

| | |
|---|---|
| Advances for costs at closing | $13,600 |
| Lot purchase price | 106,875 |
| January 30, 2008, additional advance | 25,000 |
| Less: Overpayment refund | (278) |
| Less: Payoff at sale | (30,000) |
| Net loss | 115,197 |

### 2. Grande River Home

On August 28, 2007, Prime purchased a lot at 7718 Grande River Court, Parker, Colorado (Grande River). Grande River was within the Tallman Gulch subdivision (Tallman Gulch). Petitioner had found Tallman Gulch when

[*11] searching for lots outside of the Painter's Ridge subdivision. He knew the original planner and developer of Tallman Gulch, Arieh Szigeti.

Petitioners paid $191,277 toward the purchase of Grande River. Before closing petitioners also paid Prime $10,000 to use as earnest money, and they paid $1,151 in real estate taxes for the property. On the date of purchase Prime executed a promissory note payable to petitioner for a principal amount of $232,792, with no interest. The note was payable upon the sale of a home on Grande River, and the note stated that it was secured by a deed of trust for the property.

During 2008 L. Olson reduced Prime's construction crews, and Prime fell behind schedule building the home on Grande River. Petitioner helped with landscaping the property. Petitioners paid expenses of $15,362 for landscaping Grande River. Prime reimbursed petitioners $9,675 of these expenses.

During construction of the Grande River home petitioner suggested that Prime should enter the home in the 2009 "Parade of Homes" (Parade), a trade show that he believed would bring many prospective buyers to view the property, and L. Olson agreed. Construction of the Grande River home was completed in 2009, and the home was successfully entered in the Parade. Petitioners took pictures of the property and produced marketing materials to be handed out to

[*12] viewers during the Parade.  Following the Parade in 2009 the loans that Prime had outstanding on both Grande River and Inwood Place were nearing expiration.

At petitioner's request, L. Olson authorized Bank of Choice to discuss the two loans with petitioner directly.  Petitioner wanted to ensure that the loans were extended so that Prime did not lose the homes before they could be sold profitably.  He met with employees from Bank of Choice at Grande River, and they toured the home together.  After viewing the Grande River home Bank of Choice agreed that Prime's construction loan for Grande River should be extended and that the interest rate should be reduced.

In October 2009 L. Olson informed petitioner that he could not afford to make the monthly interest payment due on Prime's loan with Bank of Choice for Grande River.  Petitioner paid the interest due in October 2009 and continued to make monthly interest payments directly to Bank of Choice through April 2010.  He made total interest payments of $29,443 on Prime's loan for Grande River.  He also paid $6,058 for Grande River's property taxes.

Grande River sold on August 6, 2010.  Before the sale petitioner was aware that the selling price would not be enough to cover the full amount that Prime owed to him and Bank of Choice for Grande River.  L. Olson agreed to sign

[*13] deficiency notes for Bank of Choice and for petitioner to cover amounts that remained outstanding after the sale of Grande River.  At the request of L. Olson petitioner released the deed of trust and the promissory note payable to him for Grande River.

Upon the sale of Grande River petitioner received a payoff of $86,698. After the sale he asked L. Olson for the signed deficiency note for the remaining amount that had been owed under the original promissory note.  L. Olson requested that the deficiency note be discounted.  Petitioner had numerous conversations with L. Olson about the deficiency that he believed he was owed for Grande River.  In late 2010 L. Olson told him that Prime would not pay to cover any of the deficiency.  Petitioners' net loss for Grande River was $156,918, calculated as follows:

| | |
|---|---|
| Earnest money | $10,000 |
| Prepaid real estate taxes | 1,151 |
| Lot purchase price | 191,277 |
| Landscaping expenses | 15,362 |
| Construction loan interest | 29,443 |
| Property taxes paid | 6,058 |
| Less:  Landscaping reimbursements | (9,675) |

**[*14]**    Less:  Payoff at sale                              (86,698)

          Net loss                                   156,918

## C.    Tallman Lots 37 and 40

In late 2007 and early 2008 petitioner and L. Olson had agreed to acquire

two lots in Tallman Gulch.  No homes were ever constructed on these lots.

### 1.    Tallman Lot 37

On November 29, 2007, petitioners paid $269,137 toward Prime's purchase

of a lot at 7753 Merryvale Trail, Parker, Colorado, which was designated lot 37 in

Tallman Gulch (Tallman lot 37).  Petitioners had paid previously $10,000 in

earnest money for Prime to purchase Tallman lot 37, and before closing they paid

$1,604 in real estate taxes.  On November 30, 2007, Prime purchased Tallman

lot 37 and issued a promissory note payable to petitioner for $321,007.  The note

had no interest rate, was payable upon the sale of a home on Tallman lot 37, and

stated that it was secured by a deed of trust for the property.

On December 28, 2007, Prime executed a quitclaim deed for Tallman lot 37

that transferred its interest in the lot to petitioners for consideration of $10.

Petitioner canceled Prime's promissory note for Tallman lot 37 and released the

deed of trust referenced in the note.  Soon after petitioners acquired ownership of

**[*15]** Tallman lot 37, Bank of Choice granted them a $199,125 loan, which was secured by a deed of trust for the property in the bank's name.

In July 2011 Bank of Choice failed. The Federal Deposit Insurance Corporation, acting as receiver for Bank of Choice, sold the assets and liabilities of Bank of Choice to Bank Midwest, N.A. (Bank Midwest), including petitioners' note. Petitioners were notified that Bank Midwest would not agree to extend the maturity date for their note.

In January 2012 Bank Midwest filed a lawsuit in the District Court, Douglas County, State of Colorado, to obtain a judgment against petitioners for the full principal and unpaid interest due on the note. Petitioners did not contest this lawsuit. Bank Midwest obtained a judgment for $210,694. The bank foreclosed on Tallman lot 37 and took possession of the property, and on June 20, 2012, the property was sold at a foreclosure sale for $89,125.

After the foreclosure sale Bank Midwest notified the district court that the judgment against petitioners was partially satisfied. In 2015 petitioners executed a Compromise Settlement and Mutual Release Agreement with an assignee of Bank Midwest, which released all claims and satisfied the judgment against them for $27,000.

[*16]      2.    <u>Tallman Lot 40</u>

On or about January 7, 2008, petitioners paid $20,000 in earnest money to reserve an option to purchase a lot at 7905 Merryvale Trail, Parker, Colorado, which was lot 40 in Tallman Gulch (Tallman lot 40). Petitioner reserved the option to purchase in his own name, and not in Prime's name. On January 6, 2009, he executed an Agreement to Amend/Extend Contract, which stated that the deadline for exercising the purchase option was 14 days after the date of sale of Grande River or no later than January 7, 2010. The agreement provided that the $20,000 in earnest money would be credited against the purchase price of Tallman lot 40 but would remain nonrefundable if the buyer did not close on the property.

Petitioner never exercised his option to purchase Tallman lot 40. He attempted unsuccessfully to have the deadline for the option to purchase extended. Petitioner did not recover the $20,000 in earnest money.

IV.    <u>Advances to Szigeti and DHP Holdings, LLC</u>

In 2006 and 2008 petitioners made advances to DHP Holdings, LLC (DHP), an entity operated by Szigeti and Szigeti's business partner Harry Markle, and to Szigeti individually. These advances were not made pursuant to the JVA.

On September 20, 2006, petitioner paid a $150,000 advance to DHP. For this advance petitioner received a document entitled "Receipt of Investment

[*17] Funds", signed by Markle, which stated: "This document is for the purpose of acknowledging the receiving of funds for investment purposes. * * * The Szigeti/Markle group has received * * * funds from Terry Yaryan for the purpose of investing in various projects. Those projects and equity stakes to be determined in a separate agreement."

Around September 30, 2008, petitioners advanced an additional $15,000 to Szigeti. A handwritten check stub for this advance describes the amount as a "loan to Arieh Szigeti * * * to be repaid by 10/30/08." Petitioners' original filed income tax returns for the years in issue did not report losses or claim any deductions in connection with the advances to DHP and Szigeti.

## V. Petitioners' Tax Reporting

Petitioners prepared their original income tax returns for years 2008-13 themselves.

### A. Original Returns for 2008-10

Petitioners filed joint Forms 1040 for 2008-10. They paid their reported tax liabilities. On petitioners' Form 1040 for 2010 they deducted a capital loss of $3,000 for Grande River. On Schedule D, Capital Gains and Losses, Part II, Long-Term Capital Gains and Losses, they reported a basis in Grande River of $202,428, a sale price of $86,698, and a net long-term capital loss of $115,730.

[*18] B.     Original Return for 2011

1.     Theft Loss Deduction

For 2011 petitioners deducted $573,398 for a "fraudulent theft loss" on Schedule A, Itemized Deductions, of their Form 1040.  They detailed the loss on Form 4684, Casualties and Thefts, Section B, Business and Income-Producing Property.  On the Form 4684 they reported losses for Grande River, Tallman lots 37 and 40 (together, Tallman lots), and Inwood Place, and they identified the losses collectively as the "Prime Realty-Olson Fraud theft".  For each of the properties they reported their basis in the property as the amount of the loss.  The Form 4684 included the following information regarding the reported losses:

| Item | Grande River | Tallman lots | Inwood Place |
| --- | --- | --- | --- |
| Cost or adjusted basis | $156,963 | $300,741 | $115,694 |
| Insurance or other reimbursement | --- | --- | --- |
| Fair market value before theft | 202,124 | 349,328 | 150,951 |
| Fair market value after theft | --- | --- | --- |
| Reported loss | 156,963 | 300,741 | 115,694 |

**[\*19]** After filing their 2011 Form 1040, petitioners filed tentative claims for net operating loss (NOL) carrybacks for 2008, 2009, and 2010 for the reported theft loss. The Internal Revenue Service (IRS) processed and allowed the claims for NOL carrybacks and, as a result, issued petitioners a refund for each of the years 2008-10.

### 2. Notice of Deficiency for 2011

The IRS examined petitioners' 2011 return. On April 1, 2013, the IRS issued a notice of deficiency disallowing the claimed theft loss deduction. On April 10, 2013, petitioner sent a letter to the Taxpayer Advocate expressing concerns about the notice of deficiency. The letter stated: "For your record, we have no business or business expenses." Petitioners did not file a petition in this Court to challenge the determinations in the notice of deficiency for 2011, and the IRS assessed the proposed deficiency, accuracy-related penalty, and accrued interest for 2011 on September 23, 2013.

### C. Original Return for 2012

On December 23, 2013, petitioners filed their Form 1040 for 2012. Petitioners' IRS account transcript shows that they requested an extension of time to file their 2012 tax return not later than October 15, 2013. On the 2012 Form 1040 they carried forward the NOL from the theft loss reported for 2011. They

[*20] reported negative income on line 21 of the 2012 Form 1040, which offset all income from other sources.

Additionally, on petitioners' 2012 Form 1040 they deducted a capital loss of $3,000 for Tallman lot 37. On Schedule D, Part II, they reported a total long-term capital loss of $119,868 in connection with the foreclosure of the property.

D.      Original Return for 2013

On petitioners' Form 1040 for 2013 they carried forward the remaining amount of the NOL from the reported 2011 theft loss. The NOL carryforward offset substantially their income for 2013. On Schedule D, Part II, for 2013 petitioners carried forward the reported long-term capital loss for Tallman lot 37. They deducted a $3,000 capital loss for 2013 based on the carryforward from 2012.

VI.    Notice of Deficiency for Years in Issue

After disallowing any deduction for petitioners' reported theft loss for 2011, the IRS conducted an examination of their NOL carrybacks and carryforwards for the years in issue. The IRS determined petitioners were not entitled to deduct the NOL carrybacks and carryforwards because they did not incur an ordinary theft loss under section 165 and their losses were capital losses.

[*21] Respondent issued a notice of deficiency on September 2, 2015, disallowing deductions for the NOL carrybacks and carryforwards for the 2011 theft loss for the years in issue. The notice of deficiency allowed petitioners a $3,000 long-term capital loss deduction for each of 2010, 2012, and 2013. The notice of deficiency determined an addition to tax under section 6651(a)(1) for 2012 and an accuracy-related penalty under section 6662(a) for 2013. The record includes a completed Civil Penalty Approval Form dated January 8, 2015, with a signature on the line provided for "Group Manager Approval to Assess Penalties Identified Above".[4]

VII.   Respondent's Amended Answer

On November 10, 2016, respondent filed the first amendment to answer (amended answer). In the amended answer respondent asserted that petitioners are further liable for the section 6662(a) accuracy-related penalty for 2012. Respondent's counsel and Associate Area Counsel, who was respondent's counsel's immediate supervisor, signed the amended answer.

---

[4]As explained infra pp. 44-46, we are reopening the record to admit the Civil Penalty Approval Form and declaration of IRS group manager Vera Goggins insofar as it authenticates the Civil Penalty Approval Form for purposes of Fed. R. Evid. 902(11).

[*22] VIII.   Amended Returns

In July 2017 petitioners with the assistance of a certified public accountant completed a Form 1040X, Amended U.S. Individual Income Tax Return, for each year in issue and for 2011.  On these returns petitioners conceded that they are not entitled to the theft loss reported originally for 2011 pursuant to section 165 and made changes to reflect that concession.  Respondent did not process or otherwise accept these returns.

Petitioners reported and claimed deductions for business bad debts pursuant to section 166 on their amended returns.  For 2008 they deducted a business bad debt of $165,000 not related to petitioner's arrangement with Prime.  For 2010 they deducted business bad debts of $457,704, including the following items: (1) $156,963 for Grande River; (2) $280,741 for Tallman lot 37; and (3) $20,000 for Tallman lot 40.  For 2011 petitioners deducted a business bad debt of $115,694 for Inwood Place.

Petitioners prepared two amended returns for 2009; on one they deducted an NOL carryforward from 2008, and on the other they deducted an NOL carryback from 2010.  On the amended returns for 2012 and 2013 petitioners reported NOL carryforwards to reflect business bad debt deductions on prior years' returns.

**[*23]**                                        OPINION

The parties agree that petitioners are not entitled to the theft loss deduction they originally claimed for 2011 and the carryforwards and carrybacks related to it. Petitioners contend that they are entitled to deduct ordinary losses and NOL carryforwards and carrybacks for business bad debts pursuant to section 166. Respondent contends that petitioners' advances to Prime or others for the joint venture properties and the advances to DHP and Szigeti do not satisfy the requirements for deductible business bad debts under section 166.

## I.      Business Bad Debt Deductions

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction allowed by the Code. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Petitioners have not claimed or shown that the burden of proof as to any relevant factual issue should shift to respondent under section 7491(a). They bear the burden of establishing that they are entitled to any bad debt deductions for the years in issue.

Section 166(a) generally allows a deduction for "any debt which becomes worthless within the taxable year." For taxpayers other than corporations, section 166(d) provides that section 166(a) does not apply with respect to any "nonbusiness debt". A nonbusiness debt is a debt other than one created or

**[\*24]** acquired in connection with a trade or business of the taxpayer or the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Sec. 166(d)(2). For a nonbusiness bad debt the taxpayer is allowed a short-term capital loss for the taxable year in which the debt becomes completely worthless. Sec. 166(d)(1); sec. 1.166-5(a)(2), Income Tax Regs. Business bad debts may be deducted against ordinary income, whether wholly or partially worthless during the taxable year, and may be carried back or forward as part of the "net operating loss deduction" under section 172. Sec. 1.166-3, Income Tax Regs.

Section 172 permits a deduction for the full amount of allowable NOL carrybacks from subsequent years and carryovers from previous years, as long as taxable income for the current year is not less than zero. Sec. 172(a), (b)(2). Petitioners bear the burden of establishing both the existence of the NOL and the amount of any NOL that may be carried forward. See Rule 142(a)(1); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955); Keith v. Commissioner, 115 T.C. 605, 621 (2000).

To deduct a loss as a business bad debt a taxpayer must show that he or she was engaged in a trade or business and that the purported bad debt was proximately related to the trade or business. Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), aff'd, 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income

- 25 -

[*25] Tax Regs. The taxpayer must establish that the amount claimed as a deduction represents a bona fide debt. Sec. 1.166-1(c), Income Tax Regs. Gifts or contributions to capital may not be deducted as bad debts under section 166. Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs. The taxpayer also must prove the worthlessness of the debt and the year in which it became worthless. Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991). Respondent argues that petitioners have not met any of these criteria to deduct business bad debts.

### A. Trade or Business

The Code does not define the term "trade or business". Deciding whether the activities of a taxpayer constitute a trade or business requires an examination of the specific facts in each case. Higgins v. Commissioner, 312 U.S. 212, 217 (1941). The taxpayer must participate in the activity with continuity and regularity, and the primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

The management of one's investments, no matter how extensive, is not considered a trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963); Higgins v. Commissioner, 312 U.S. at 218. The taxpayer's activities as an investor may produce income or profit, but profit from investment is not taken as

**[\*26]** evidence that the taxpayer is engaged in a trade or business. Any profit so derived arises from the successful conduct of the trade or business of the corporation or other venture in which the taxpayer has taken a stake, rather than from the taxpayer's own activities. Whipple v. Commissioner, 373 U.S. at 202. The objective facts surrounding a taxpayer's advances, rather than his or her subjective intent, controls in determining whether the advances should be treated as trade or business or investment activity. See Litwin v. United States, 983 F.2d 997, 1000 (10th Cir. 1993).

### 1. Joint Venture Properties

Petitioners contend that petitioner was in the trade or business of investing in vacant lots, constructing single-family residences, and selling residences to the public, as stated in the JVA. They argue that the JVA required that petitioner and Prime "have equal rights in the management of Joint Venture business" and that petitioner had the right and responsibility to participate in all aspects of the joint venture. They contend that petitioner actively participated with continuity and regularity with the objective of making the joint venture properties as profitable as possible. The parties agree that petitioners were not in a trade or business of lending funds.

[*27] Under the terms of the JVA petitioner held certain rights to participate in the joint venture. Those rights were to participate in the selection of vacant lots and in the management of activities to the extent not otherwise provided in the JVA. Petitioner's responsibility under the JVA was to provide funds to Prime for the purchase of the lots. The JVA provided that Prime was "solely and exclusively responsible for all aspects of development, design, construction, marketing, and sale" of the properties. Prime was required to incur the risk associated with building and marketing the constructed residences by financing construction with its own funds or loans held solely in its name.

Petitioner testified credibly that he did perform some work in connection with the joint venture properties before and during the years in issue. He worked with L. Olson in selecting the vacant lots that Prime purchased, he interacted with Prime's construction lender to extend Prime's loans, and he performed some landscaping and marketing work in preparation for the Parade. Generally, petitioner's work was directed towards helping Prime sell the constructed homes at a profit, but he was not required under the JVA to perform these activities.

A common factor distinguishing the conduct of a trade or business from investment is the receipt by the taxpayer of compensation other than the normal investor's return. Whipple v. Commissioner, 373 U.S. at 202-203. Compensation

**[\*28]** other than the normal investor's return generally means income received by the taxpayer directly for his or her services rather than indirectly from the success of the enterprise in which he or she has invested. Id. at 203. The income that petitioner received from the joint venture properties was not compensation for his services.

Under the terms of the JVA petitioner's compensation for the joint venture properties was directly linked to his providing capital to Prime. For each property the principal amount that he was owed under the promissory note represented a return of his investment, plus an additional 15%. The income that he received did not depend on the amount of services that he provided but depended instead on Prime's successful activities as the builder and marketer of the properties. The facts and circumstance indicate that petitioner's role in the development and sale of the joint venture properties was that of an investor, rather than an individual engaged in a trade or business.

Petitioners contend that they were engaged in one or multiple real property trades or businesses. Section 1221(a)(1) defines a capital asset as "property held by the taxpayer * * * but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". Petitioners contend that Prime held the constructed homes on the joint venture

[*29] properties for sale to customers in the ordinary course of business and that because of petitioner's participation in the JVA with Prime they should be allowed to report losses for the properties as ordinary, rather than capital, losses.

The Court of Appeals for the Tenth Circuit has concluded that the following factors are relevant for determining whether real property is held by the taxpayer in a trade or business: (1) the purpose for which the property was acquired, (2) the activities of the taxpayer and those acting on his or her behalf, (3) the continuity of sales and their frequency, and (4) any other fact relevant to the determination of whether a sale was a transaction of a trade or business. Brown v. Commissioner, 448 F.2d 514, 516-517 (10th Cir. 1971), aff'g 54 T.C. 1475 (1970). Petitioners did not own the properties that were developed and sold under the JVA. Petitioner provided capital for Prime's purchases of vacant lots and received promissory notes which were tied to sales of homes to be constructed by Prime on the lots. Pursuant to the terms of the JVA petitioner never held properties for sale to customers, and petitioners did not report income related to a purported trade or business on their tax returns. Petitioner in a letter to the Taxpayer Advocate indicated that he did not have a business and had no business expenses. Prime held, developed, and sold the joint venture properties in its name.

[*30] Even if we accepted petitioners' contention that Prime's activities should be treated as part of petitioner's trade or business for the years in issue, only two properties, Inwood Place and Grande River, could be considered part of the purported real property trade or business with Prime. Construction of the home on Inwood Place was completed in 2007, and the Grande River home was completed in 2009. Petitioner and Prime did not attempt to develop or sell any other real properties until Grande River sold in 2010 and Inwood Place sold in 2011. Sales of two properties for all of the years in issue cannot be called frequent.

Petitioners owned Tallman lot 37 during the years in issue. After petitioners acquired ownership of the lot from Prime in December 2007, petitioner canceled Prime's note for Tallman lot 37. Therefore, the terms of the JVA did not apply to this lot during the years in issue.

Petitioner's purpose for acquiring Tallman lot 37 from Prime was to use it as collateral for a loan to replenish petitioners' bank accounts until such time as he could recoup his investment in one or more of the other properties that Prime had purchased. He testified that he intended to resell the lot to Prime so that Prime could build a home on the lot and sell it to customers. No development occurred while petitioners owned the lot.

[*31] They held Tallman lot 37 from 2007 until 2012, when it was repossessed for failure to repay their loan, and during that time they did not acquire any other lots or make any sales of real property. The relevant factors do not support a conclusion that petitioners held Tallman lot 37 for sale to customers in the ordinary course of a trade or business. There was never any development on Tallman lot 37.

Neither petitioner nor Prime ever held an ownership interest in Tallman lot 40. Petitioner held an option to purchase this lot, but he never advanced the funds to purchase it. The terms of the JVA did not apply to Tallman lot 40, and it cannot be considered part of the purported real property trade or business conducted by petitioner through the JVA for the years in issue.

With respect to the joint venture lots purchased and developed under the terms of the JVA, petitioners' reliance on cases that determine a taxpayer's principal purpose for owning real property is misplaced, because they did not own or sell these properties. Petitioner had no responsibility to develop or market the lots to customers; he held an investment interest. Although petitioners owned Tallman lot 37, they did not develop, market, or sell it. We conclude that petitioners were not in engaged in a trade or business for the sale of real property during the years in issue.

**[*32]**    2.    <u>2008 Loss</u>

On their amended return for 2008 petitioners claim for the first time a bad debt deduction for advances made to Szigeti and to DHP. Their dealings with Szigeti and DHP were not conducted under the terms of the JVA. Petitioners provided no evidence showing how the advanced funds were used.

The receipt that Markle signed for the 2006 advance states that the funds were received for investment purposes and that equity stakes would be determined in further documentation. Petitioners provided no evidence about activities, continuous or otherwise, that they performed for a trade or business in connection with these advances. We conclude that the $165,000 was not advanced for a business purpose because petitioners were not engaged in a trade or business in connection with these advances.

B.    <u>Bona Fide Debts</u>

Since we have concluded that petitioners were not engaged in a trade or business during the years in issue, we now consider whether there was nonbusiness bad debt. Petitioners are required to show that the losses associated with the joint venture properties and the 2008 loss were due to the worthlessness of a bona fide debt in order to claim a deduction under section 166. <u>See</u> sec. 1.166-1(c), Income Tax Regs. "A bona fide debt is a debt which arises from a

[*33] debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Id. Whether an advance gives rise to a bona fide debt for Federal tax purposes is determined from all the facts and circumstances. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). Where the facts indicate that no bona fide debt was created, an advance may properly be classified as a contribution to capital. See Davis v. Commissioner, 69 T.C. 814, 835-836 (1978); Rutter v. Commissioner, T.C. Memo. 2017-174.

Petitioners contend that the advances made to Prime through the JVA created bona fide debts. They argue that the payments cannot be considered equity payments because petitioner obtained promissory notes secured by deeds of trust and because he held no ownership interest in Prime. Respondent contends that petitioners' advances in this case did not create bona fide debts and that the advances were more akin to equity than debt.

In resolving questions of debt versus equity, courts have identified and considered various factors. See Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 285 (1990). Those factors include: (1) the names given to the certificates evidencing the indebtedness, (2) the presence or absence of a fixed maturity date, (3) the accrual and payment of interest, (4) the source of payments, (5) the right to enforce payments, (6) participation in management as a result of the advances,

**[\*34]** (7) the status of the advances in relation to regular corporate creditors, (8) the intent of the parties, (9) the identity of interest between creditor and shareholder, (10) thin or adequate capitalization, (11) the risk involved in making the advances, (12) the use to which the advances were put, (13) the ability of the borrower to obtain credit from other sources, and (14) the failure of the debtor to repay. Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493; see also Am. Offshore, Inc. v. Commissioner, 97 T.C. at 602-606; Goldstein v. Commissioner, T.C. Memo. 1980-273. The above factors are only aids in evaluating whether the transferred funds should be regarded as risk capital or as bona fide loans made pursuant to a debtor-creditor relationship. Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); see Calumet Indus., Inc. v. Commissioner, 95 T.C. at 285-286. No single factor is determinative, and not all factors are applicable in each case. Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

      1.     Inwood Place

Petitioners on their amended 2011 tax return claim a bad debt deduction of $115,694 for Inwood Place. The notice of deficiency on which this case is based does not cover 2011. Petitioners had received previously a separate notice of deficiency for 2011 and had not filed a petition with this Court. On September 23,

[*35] 2013, respondent assessed the determined deficiency, accuracy-related penalty, and accrued interest for that year.

The Tax Court is a court of limited jurisdiction, and we may exercise our jurisdiction only to the extent authorized by Congress. See sec. 7442; Naftel v. Commissioner, 85 T.C. 527, 529 (1985). We do not have jurisdiction to determine whether the tax for any year not included in the notice of deficiency has been overpaid or underpaid. Sec. 6214(b). Therefore, we cannot determine that petitioners are eligible for a bad debt deduction for 2011.

      2.    Grande River

Petitioners claimed a bad debt deduction on their 2010 amended return of $156,963 for Grande River. For Grande River, Prime issued petitioner a promissory note which stated that it was secured by a deed of trust. A genuine debtor-creditor relationship must be accompanied by "more than the existence of corporate paper encrusted with the appropriate nomenclature captions." Tyler v. Tomlinson, 414 F.2d 844, 850 (5th Cir. 1969).

The promissory note for Grande River lacked a fixed maturity date and stated that payment would be due upon the sale of a home on the property. The note stated that petitioner was the beneficiary of a deed of trust for the property, but no provision in the note stated a date upon which petitioner could

**[*36]** unconditionally demand payment and after which Prime would be in default. The fact that the note provided an open-ended, rather than fixed, date for repayment indicates that petitioner's advances were equity investments and not bona fide debts.

The note that petitioner held for Grande River did not require any periodic accrual or payment of interest. It required only that Prime pay a fixed amount at the time it sold the property. A true lender is concerned with interest, and petitioner's failure to include a separate interest rate for the note indicates that he expected to take an equity stake in the development of Grande River rather than act as a bona fide creditor. See Am. Offshore, Inc. v. Commissioner, 97 T.C. at 605.

The absence of a fixed maturity date and a payment schedule indicates that repayment was tied to the fortunes of Prime's business, a sign of an equity advance rather than a bona fide debt. Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972). Repayment of petitioner's advance was contingent on Prime's sale of the home. Petitioner had no right to demand payment unless and until Prime made a sale. If repayment is possible only out of the borrower's earnings, the transaction appears to be a contribution to capital. Am. Offshore, Inc. v. Commissioner, 97 T.C. at 602.

[*37] Petitioner did not receive promissory notes from Prime for the advances paid for Grande River after its purchase, including the payments advanced for landscaping expenses, construction loan interest, and property taxes. Petitioner testified that L. Olson promised to repay him if petitioner agreed to make the construction loan interest payments beginning in October 2009. Petitioner also testified that at this time he began to suspect that Prime was broke. His failure to obtain or request formal promissory notes or other security under these circumstances indicates that these payments were not intended to be bona fide debt.

After October 2009 petitioner believed that Prime was struggling to pay expenses. He testified that he continued to make the interest payments on Prime's construction loan for Grande River because he feared that if he did not Prime would default on the loan and lose the property before it could be sold and before he could recoup his already substantial investment. Advances made to an insolvent debtor generally do not create debts for tax purposes but are characterized as capital contributions or gifts. See Dixie Dairies Corp. v. Commissioner, 74 T.C. at 496-497. The chance that petitioner's continued advances would be repaid was far more speculative than any third-party creditor would accept. See Fin Hay Realty Co., 398 F.2d at 697.

**[*38]** We conclude that petitioner's transfers of funds to Prime for Grande River did not create bona fide debt. Consequently, we do not need to address whether the purported debts became wholly worthless in the years in issue.

        3.     <u>2008 Loss</u>

Petitioners did not claim a deduction for the 2008 loss on their original income tax return filed for any of the years in issue. At trial they provided evidence of payments made in 2006 and 2008, and they contend that they never received repayment from DHP or Szigeti for these advances. The receipt signed by Markle records that petitioner advanced $150,000 "for the purpose of investing in various projects" and specifically provides that the parties' "equity stakes" in these projects will be determined in a separate agreement.

The only evidence that petitioners provided with respect to the 2008 advance to Szigeti is a home equity line of credit activity record, which shows a $15,000 draw on petitioners' account, and a copy of a check stub, which purportedly describes the purpose of the advance but was not attached to the actual check. The check stub reporting petitioners' advance to Szigeti describes the payment as a loan, but petitioners did not provide a note or any other documentation reflecting the parties' mutual intent to create a debtor-creditor

[*39] relationship. The check stub does not describe any loan terms except that the amount was to be repaid in one month.

With respect to both the 2006 and 2008 advances, there is no evidence that interest was charged and no indication as to how petitioners' funds would be used or what the expected source of their repayment would be. Petitioners' evidence is insufficient to establish that there was a debtor-creditor relationship for the 2006 and 2008 advances. They are not entitled to a deduction under section 166 for the 2008 loss because there was no bona fide debt. See sec. 1.166-1(c), Income Tax Regs.

4.    Tallman Lot 37

On their amended return for 2010 petitioners claimed a bad debt deduction of $280,741 for Tallman lot 37. Prime issued a promissory note payable to petitioner for $321,007 in connection with the initial purchase of this lot. On December 28, 2007, Prime executed a quitclaim deed for Tallman lot 37 that transferred its interest in the lot to petitioners. Petitioner canceled Prime's promissory note for the lot and released the deed of trust at the beginning of 2008. Prime was no longer a debtor and petitioner was no longer a creditor. Since there was no bona fide debt, petitioners are not entitled to a bad debt deduction. See id.

**[\*40]**      5.      <u>Tallman Lot 40</u>

On their amended return for 2010 petitioners claimed a bad debt deduction of $20,000 for Tallman lot 40.  Petitioner reserved the option to purchase Tallman lot 40 in his own name, and not in Prime's name.  He did not purchase Tallman lot 40 and did not recover the $20,000 in earnest money.[5]  Petitioners did not lend anyone any money with respect to Tallman lot 40, and therefore they cannot claim a bad debt deduction.  See <u>id.</u>

6.      <u>Conclusion</u>

We conclude that petitioners did not have any bona fide debts during the years in issue.  They are not entitled to the NOL carryback and carryforwards related to bad debt deductions that they claimed on their amended returns for the years in issue.

II.    <u>Section 6651(a)(1) Addition to Tax</u>

Section 6651(a)(1) imposes an addition to tax if the taxpayer fails to file his or her income tax return by the required due date (including any extension of time for filing).  A taxpayer has the burden of proving that failure to timely file was due to reasonable cause and not willful neglect.  <u>See</u> sec. 6651(a)(1); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 447 (2001).

---

[5]Petitioner purchased an option to purchase, which expired.

**[*41]** Under section 7491(c) the Commissioner bears the burden of producing evidence with respect to the liability of the taxpayer for any additions to tax. See Higbee v. Commissioner, 116 T.C. at 446-447. Petitioners' IRS account transcript reflects their request for an extension of time to file their 2012 income tax return not later than October 15, 2013. They filed their 2012 return on December 23, 2013. Respondent has met the burden of production.

Petitioners provided no explanation as to why their tax return was filed late for 2012. We sustain respondent's determination of the addition to tax under section 6651(a)(1).

III.    Section 6662(a) Penalties

Respondent determined that for 2012 and 2013 petitioners are liable for accuracy-related penalties pursuant to section 6662(a). Section 6662(a) and (b)(1) and (2) imposes a 20% penalty on any portion of an underpayment of Federal income tax that is attributable to negligence or disregard of rules or regulations or a substantial understatement of income tax. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1). Petitioners reported no tax liability for 2012 or 2013. As determined in the notice of deficiency petitioners' understatements of income tax for these years were substantial.

**[\*42]** The Commissioner bears the burden of production with respect to penalties. Sec. 7491(c). Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447. Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." In Graev v. Commissioner (Graev III), 149 T.C. __ (Dec. 20, 2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C. 460 (2016), we held that the Commissioner's burden of production under section 7491(c) includes establishing compliance with the supervisory approval requirement of section 6751(b).

Trial of this case was held, and the record was closed, before we vacated our decision in Graev II and issued Graev III. In the light of the Court's decision in Graev III, we ordered respondent to file a response addressing the effect of section 6751(b) on this case and directing the Court to any evidence of supervisory approval of the penalties in the record of this case.

[*43] On January 10, 2018, respondent filed a seriatim answering brief, addressing for the first time the issue of compliance with section 6751(b) as it relates to the penalties determined in this case.  Respondent asserted the penalty against petitioners for 2012 in the amended answer.  In Roth v. Commissioner, T.C. Memo. 2017-248, at *10-*11 (citing Chai v. Commissioner, 851 F.3d 190, 221 n.24 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-14), this Court observed that the Commissioner routinely asserts section 6662 penalties in answers and that we have jurisdiction over them pursuant to section 6214(a).  We held that the Commissioner may, consistent with both Chai and Graev III, assert additional penalties in the answer and that a delegate of the Chief Counsel for the IRS (who represents the Commissioner) is the proper individual to do so in this Court.  Roth v. Commissioner, at *11.

We held in Roth v. Commissioner, at *11, that IRS counsel, serving as the Chief Counsel's delegate, had complied with section 6751(b)(1) by obtaining the approval and signature of the Associate Area Counsel who was her immediate supervisor.  In this case the Associate Area Counsel acting as respondent's counsel's immediate supervisor signed the amended answer.  Therefore, respondent has met the burden of production for 2012.

**[*44]** Respondent also bears the burden of proof with respect to the 2012 penalty, because it was asserted for the first time in respondent's answer. See Rule 142(a). The evidence establishes that petitioners' understatement of income tax for 2012 was substantial within the meaning of section 6662(d)(1), and therefore respondent has met the burden of proof.

Respondent determined the accuracy-related penalty for 2013 in the notice of deficiency and did not provide at trial evidence of supervisory approval of the penalty pursuant to section 6751(b)(1). In response to the Court's order dated January 10, 2018, respondent moved to reopen the record to offer into evidence (1) the declaration of Ms. Goggins, the group manager[6] of the IRS examiner that conducted the examination of petitioners' returns for the years in issue, and (2) a Civil Penalty Approval Form signed by the supervisor and dated before the issuance of the notice.

Reopening the record for the submission of additional evidence lies within the Court's discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S.

---

[6]Ms. Goggins signed the form as "Group Manager". However, the Internal Revenue Manual (IRM) as then in effect, see IRM pt. 20.1.1.2.3(1), (8) (Aug. 5, 2014), specified that the approval must be by the "immediate supervisor", as the statute requires. The presumption of regularity, see Walker v. Commissioner, T.C. Memo. 2018-22, at *19 n.6, warrants the presumption that Ms. Goggins was the immediate supervisor.

**[*45]** 321, 331 (1971); <u>Butler v. Commissioner</u>, 114 T.C. 276, 286-287 (2000). We will grant a motion to reopen the record only if the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. <u>Butler v. Commissioner</u>, 114 T.C. at 287.

The evidence that is the subject of respondent's motion would not be cumulative of any evidence in the record, and it would not be impeaching material. Respondent bears the burden of production with respect to penalties and would offer the evidence as proof that the requirements of section 6751(b)(1) have been met. The subject evidence is material to the issues involved in the case, and we conclude that the outcome of the case will be changed if we grant respondent's motion.

In petitioners' response to respondent's motion they argue that "[i]t would not be in the best interests of justice to reopen the record when the law was clear at the time the record closed." When this case was submitted and the record closed, <u>Graev III</u> had not been issued and petitioners had not raised section 6751(b) as an issue. Respondent was justified in concluding that introduction of the Civil Penalty Approval Form was not necessary. We agree with respondent that the

**[*46]** Civil Penalty Approval Form is not cumulative and is material to the penalty issue in this case.

We also agree with respondent that the Civil Penalty Approval Form is a record kept in the ordinary course of a business activity and is authenticated by the declaration of the immediate supervisor. See Fed. R. Evid. 803(6), 902(11). Petitioners do not challenge the evidence as unreliable. We will admit the Civil Penalty Approval Form into evidence and the declaration for the purpose of authentication under rule 902(11) of the Federal Rules of Evidence. See Clough v. Commissioner, 119 T.C. 183, 190-191 (2002). Respondent has met the burden of production for the penalty for 2013.

Once the Commissioner meets the applicable burden, the taxpayers must come forward with persuasive evidence that the penalty is inappropriate because, for example, they acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. Petitioners have not shown reasonable cause for the underpayments of tax for 2012 and 2013. At the time that petitioners filed their 2012 and 2013 income tax returns, respondent had already issued the 2011 notice. The 2011 notice disallowed in full the reported theft loss to which petitioners' claimed NOL carryforwards for 2012 and 2013 related.

[*47] Petitioners contend that petitioner consulted a lawyer, a tax preparer, and IRS publications concerning theft loss deductions before filing the 2011 Form 1040. Petitioners claimed both ordinary loss and capital loss deductions for several properties. They did not act with reasonable cause and in good faith when they continued to claim NOL carryforwards for a purported theft loss for which they knew that deductions had been fully disallowed. We hold that petitioners are liable for the accuracy-related penalties under section 6662(a) for 2012 and 2013.

To reflect the foregoing,

Decision will be entered

under Rule 155.